1   CHARLES A. BONNER, State Bar No. 85413
    A. CABRAL BONNER, State Bar No. 247528
2   **LAW OFFICES OF BONNER & BONNER**
    475 Gate Five Road, Suite 211
3   Sausalito, California 94965
    Tel: (415) 331-3070
4   Fax: (415) 331-2738
    cbonner799@aol.com
5   cabral@bonnerlaw.com
6
7   Counsel for Defendant
    KIMBERLY BRYANT
8

9                        **UNITED STATES DISTRICT COURT**

10                      **NORTHERN DISTRICT OF CALIFORNIA**

11

12  BGC, INC.,                              Case No. 3:22-CV-04801-JSC
13         Plaintiff,
                                            **DEFENDANT KIMBERLY BRYANT'S**
14  v.                                      **ANSWER**
                                            **AND COUNTER-CLAIMS/CROSS-**
15  KIMBERLY BRYANT and DOE 1,              **CLAIMS [Filed Concurrently Herewith]**

16         Defendants.
17  _____
    KIMBERLY BRYANT, an individual,
18
19         **Cross-Complainant**
20         vs.
21  BLACK GIRLS CODE, a California Non-
    Profit Public Benefit Corporation;
22  HEATHER HILES, an individual; STACY
    BROWN-PHILPOT, an individual,
23  SHERMAN WHITES, an individual; SOFIA
    MOHAMMED; WELLS FARGO &
24  COMPANY, CHARLES W. SCHARF,
    MICHAEL P. SANTOMASSIMO, and
25  DOES 1-50, Inclusive.
26
27         **Cross-Defendants.**
28

                                        1

**INTRODUCTION**

1.       Defendant/Cross-Complainant KIMBERLY BRYANT, files this original answer to plaintiff BGC, INC's original complaint. Cross-Defendants, and each of them, conspired to take over Defendant/Cross-Complainant Kimberly Bryant's non-profit corporation, Black Girls Code, that she founded in 2011. Plaintiff/Cross-Defendants have wrongfully removed and excluded Ms. Bryant from Black Girls Code, and wrongfully transferred to themselves her sole proprietor Wells Fargo bank accounts without her consent, knowledge and over her objection. Plaintiff/Cross-Defendants' fraudulent and illegal acts and conduct has caused, and continue to cause Ms. Bryant irreparable injury, damage, and harm where money damages are an inadequate remedy.

**STATEMENT OF FACTS**

**BGC Thrives on Substantial Donations**

Since approximately 2011, BRYANT has spearheaded efforts to provide access to technology and technological training to underprivileged girls of color through BGC. BRYANT, who initially funded BGC from her own 401K account, is an electrical engineer who has led and served as BGC's CEO since its formation. Under BRYANT's leadership, BGC has provided over 30,000 young women with access to skills in computer programming and technology through BGC classes taught by over 4,000 volunteers. BRYANT has been at the forefront of the movement to open the 'tech world' doors to Black girls who have long been left out of that industry. BRYANT is a respected thought leader and one of the less than 1% women of color who led nonprofit organizations in the area of tech education and/or other peripherally related ecosystems. She is a well acknowledged and respected global and Silicon Valley leader, who has dedicated herself to the founding, growth, and expansion of BGC from a single chapter in the Bay Area to 15 chapters in major cities across the US and South Africa, including a second headquarters in New York City sponsored by Google.

As an organization, BGC has grown from a grass-roots level non-profit organization that has received approximately $6,500,000 in donations through 2019 to an exponentially expanding organization that had received more than $30,000,000 in funding by the close of 2020. During the pandemic, BRYANT led BGC through an unprecedented shift to virtual programming that allowed the organization's student reach to expand exponentially. This resulted in BGC reaching over 10,000 students in 2020 alone, while doubling its staff and experiencing a 1,000 percent increase in

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

revenue. BGC is now an internationally recognized non-profit due to generous public gifts and on account of strategic corporate partnerships which have positioned BGC to continue to grow well into the future.

**HILES Takes an Interest in BGC for her Personal Benefit**

Concurrent with the success and notoriety that BGC obtained on account of the influx of generous funding and donations through 2021, HILES took a keener interest and a more active role on BGC's Board. Unbeknownst to BGC and BRYANT, HILES was eager to salvage her professional reputation. HILES, the first President of Calbright College, was forced to resign in 2020 following the failure of Calbright's first state audit amidst findings of mismanagement, cronyism, and potential fraudulent use of state funds. Following her resignation, HILES sought to defend her reputation by candidly admitting that "[i]t is easy to blame the founding CEO for everything..."

Following BGC's exponential increase in charitable donations during and following the pandemic, HILES became more active in their role as a director. Upon information and belief, BRYANT alleges that HILES sought to capitalize on BGC's growth and increased funding for her own personal gain. BRYANT is informed and believes that since approximately September of 2020, HILES has been a director at Udemy, a global marketplace for learning and online education.

In or about August 27,2020, HIILES sent a text message to BRYANT, stating that she had joined the Board of Udemy, and that Udemy was pre-Initial Public Offering ("IPO"). At some point following HILES' text message, BRYANT looked at the regulatory filings for Udemy and confirmed that HILES was a paid Board member and that Udemy was poised to move for IPO status.

In or about February 16, 2021, in connection with preparing for Udemy's IPO, HILES attempted to arrange a partnership between BGC and Udemy.  In response and on that same date, BRYANT, in the presence of Defendant BROWN-PHILPOT, repeatedly warned and emphasized to HILES of the impropriety of HILES' attempt to arrange a partnership between BGC and Udemy. BRYANT reminded HILES that BGC was already pursuing and engaged in a partnership with Udemy's closest competitor, Coursera. HILES was relentless in her insistence that BGC engage in partnership with Udemy since the company sought to go public in the forthcoming year stating, "this would be good for Udemy".  BRYANT repeated her objection to HILES' attempt to engaged

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

BGC in a partnership with Udemy, expressly asserting that such a partnership would be an illegal conflict of interest because HILES was a paid Board member of Udemy.  As a result of HILES' unrelenting inducement directed at BRYANT and other BGC staff regarding the 'necessity' of BGC partnering with Udemy, BRYANT objected to HILES' nomination as BGC's interim chair based upon concerns with HILES' lack of ethical standard concerning her inability to refrain from engaging in self-dealing and in her disregard of a glaringly apparent conflict of interest.

BRYANT further alleges on information and belief that HILES intentionally impeded BGC's establishment of a $20,000,000 endowment which was fully approved by the Board in June 2021. Although the endowment could have been implemented by the late spring or early summer of 2021, HILES unilaterally impeded the establishment of the endowment. As acting Treasurer and interim Chair of the Board, HILES refused to follow through with the Board's June 2021 Resolution to fund the endowment. BRYANT alleges on information and belief that the purpose of the delay was on account of HILES intention to divert the endowment funds to a venture capital firm which again, HILES had a personal financial interest in as then acting managing partner. During the course of several meetings with principals of WestFuller, HILES made a "soft pitch" to the partners at WestFuller. Nevertheless, BRYANT again objected to HILES blatant conflict of interest and self-dealing**.** Following the meeting with the principals of WestFuller, Lola West and Ian Fuller, HILES still refused to complete the final signatures necessary for moving the investment forward for the endowment by referring to the necessity of an additional vote by the BGC board although this particular measure had already been approved by the BGC Board in June. When BRYANT pointed out that the full Board had unanimously approved the establishment of the endowment in June which was affirmatively reflected in the Board's minutes from the June meeting, HILES finally relented and gave her "approval" to move forward on November 12, 2021.

However, on account of BRYANT's subsequent suspension initiated and instigated by HILES and members of a self-appointed special committee just a few weeks following this interaction, the transfer of funds to the endowment account was obstructed and did not occur. HILES achieved her intended result.

On October 5, 2021, BRYANT further objected to HILES simultaneously acting as Treasurer and serving as interim Chair of the Board. BRYANT asserted HILES' conduct was in violation of Corporation Code Section 5213 which provided that "Any number of offices may be

held by the same person unless the articles or bylaws provide otherwise, <u>except that no person serving as the secretary, the treasurer, or the chief financial officer may serve concurrently as the president or chair of the board</u>." In direct response to this and other additional objections by interjected by BRYANT, HILES embarked on an unrelenting campaign of retaliation and harassment against BRYANT, including the engineering and implementation of BRYANT's suspension and termination from the Board and both her removal as CEO and termination of her employment.

In perpetuating her campaign of retaliation against BRYANT, HILES manipulated the resignation letters of two employees who were steered in the direction of blaming BRYANT as its cause.

Over the summer months of 2021, two employees—Isis Miller and Anesha Grant-- of BGC resigned and expressed concerns over BGC's workplace culture. There specific allegations were that BGC's workplace culture was "toxic". In response to the resignations, BRYANT, in July of 2021, immediately convened a Board meeting to discuss the specific concerns raised by the two employees. On July 1, 2021, at 1:13 pm Isis Miller ("Miller") sent a resignation letter directly to the Board. On the same day, July 1, 2021, at 2:00 pm, Anesha Grant ("Grant"), Isis Miller's supervisor, sent a resignation letter to BRYANT but then, after an unauthorized private meeting between HILES, Grant and Miller, Grant sent a revised and much longer resignation letter to the Board that now included many of the complaints raised by Miller's letter that had been absent from the first letter sent to BRYANT. Upon information and belief, HILES was integral in assisting Anesha Grant in drafting her amended letter of resignation to the Board.

On July 2, 2021, at an emergency BGC Board meeting, HILES admitted that she had reached out and met with Miller and Grant without Board approval. HILES, who as a Board member required to adhere to BGC's internal policies, was neither tasked nor permitted to speak with resigned personnel and was reprimanded for her actions by then Board chair, Dr. Stephanie Adams. Despite expressly violating BGC internal policies, HILES refused to divulge to the Board the specifics of her conversations with Miller and Grant, but instead, deflected attention away from herself and before the entire Board, disparaged BRYANT's character and her ability to sufficiently lead BGC in the future. Since Miller had made allegations in her resignation letters that BRYANT had "mis-gendered" her by referring to her as "she" instead of "they," a reasonable inference

existed that HILES' blatant hostility against BRYANT suggested that HILES' wholly supported and affirmed Miller's allegation of mis-gendering on account that such allegation was lacking any additional evidence other than Miller's testimony to support such a claim.

During the meeting HILES was admonished for her conduct by Board chair, Dr Stephanie Adams and on account of HILES display of partiality, the Board agreed that it would explore the potential of hiring an independent investigator to conduct an employee survey to determine the veracity and extent of Miller and Grant's allegations. Thereafter BRYANT met with Board members, including former Board Chair Dr. Stephanie Adams, to discuss the personnel issues raised by the July 2021 resignations. At that time, BRYANT and Dr. Adams agreed that the issues presented by the resignations did not warrant involvement of legal counsel, but that BGC should still conduct the staff survey as previously discussed. HILES and BROWN-PHILPOT, however, raised strong opposition to the decision made by Dr. Adams and requested that the Board meet anew to discuss the issues.

**HILES Uses Employee Resignations to Oust BRYANT**

Over the summer months of 2021, three employees of BGC resigned over expressed concerns with BGC's workplace culture. In response to the resignations, BRYANT, in July of 2021, convened an emergency meeting of the Board to discuss the concerns raised by the resigning employees.

At this meeting BRYANT proposed that BGC take immediate action to improve BGC's workplace culture, including the hiring of a cultural consultant and a Chief Strategy Officer to improve BGC's efforts of remediating BGC's workplace environment. On or about October of 2021, BGC did in-fact hire Karla Monterroso, the former CEO of the racial equity non-profit Code2040 as a special consultant to evaluate the inner workings of BGC. BRYANT also met with Edgility Consulting to launch an initiative to improve staff compensation and to provide coaching and mentorship to the senior leadership.

On or about September 22, 2021, Dr. Adams resigned from her role as BGC Board Chair which subsequently left a vacancy seat on the Board. HILES immediately and aggressively began campaigning to succeed Dr. Adams as Board Chair, despite holding the position as acting Treasurer which according to BGC bylaws precluded her from holding both positions simultaneously.

On or about September 28, 2021, BRYANT received a memorandum purportedly from the

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

BGC Board sent from Board member Sherman Whites requesting immediate information from BGC's legal counsel as to the insurance policies provided for BGC's Directors and Officers, as well as clarification of the official communications between BGC and the employees who resigned in July, 2021. This communication precipitated a slurry of email communications between BRYANT and other members of the Board including SHERMAN WHITES, HEATHER HILES, and STACY BROWN-PHILPOT, who endeavored to install HILES (although she was currently serving as BGC Board treasurer), as the interim Board chair by vote over email. BRYANT responded that pursuant to the bylaws, a formal meeting was required on the issues raised and in answer to the Board's queries responded that (1) Loeb & Loeb, LLP was BGC's legal counsel, (2) BRYANT would provide the insurance policy requested, and (3) it had already been determined that the employee resignations did not warrant the involvement of legal counsel. BRYANT further requested a formal meeting of the Board to elect a new Board Chair, which was vacant due to the resignation of Dr. Adams.

On or about October 5, 2021, a special Board meeting was convened by Board member SHERMAN WHITES.  Prior to this meeting BRYANT sent a memorandum to her fellow Board members outlining her concerns regarding HILES conduct and demeanor including intentionally violating Board bylaws and protocols, workplace bullying, self-dealing, conflict of interest, and other workplace misconduct. BRYANT requested to read allowed the contents of the memorandum at the start of the Board meeting which did in fact occur over HILES' objection. The memorandum set out additional details of HILES misconduct and self-dealing.  Nevertheless, despite BRYANT's strenuous objections, HILES was nominated for the interim Board Chair by SHERMAN WHITES and seconded by STACY BROWN-PHILPOT. Now serving unlawfully as both BGC's Treasurer and Chair of the Board, HILES indicated that she was going to create a "Special Committee" comprised of HILES, BROWN-PHILPOT, and WHITES to investigate "employee workplace concerns." No vote was taken with respect to the creation of a "Special Committee" despite such was required prior to its commencement.

BRYANT alleges upon information and belief that at some point on or about October of 2021, the Board held a meeting without proper notice and in violation of the BGC bylaws that specifically excluded BRYANT, who as CEO, had been serving as the Board's President. At that unauthorized October 2021 meeting, a "Special Committee" was formed consisting of Defendants,

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

HILES, BROWN-PHILPOT, and WHITES, with the express purpose of inquiring into employment and human resources matters. It was understood that the Special Committee would report back to the full Board with its findings and recommendations. BRYANT further alleges that, prior to the unauthorized meeting promulgating the creation of a Special Committee, HILES had independently consulted with Holly Lake, an attorney associated with the law firm DLA Piper who was in attendance at the unauthorized meeting despite the fact that the firm had not yet been contractually engaged by BGC which was a requirement prior to consultation. Thereafter, Board member STACY BROWN-PHILPOT, in acting on behalf of the Special Committee, strong armed BRYANT into agreeing to retain DLA Piper as legal counsel on "employment related issues." BRYANT however was unaware nor was she notified that DLA Piper was tasked with conducting an investigation into allegations of BRYANT's own workplace misconduct.

Around the time of the formation of the Special Committee in October of 2021, BRYANT had formally requested that HILES be investigated for workplace misconduct in connection with a meeting of the Board of Directors on July 2, 2021. During the July 2, 2021 Board meeting, HILES verbally assaulted BRYANT and was reprimanded by Board chair, Dr. Stephanie Adams for her inappropriate conduct. On account of BRYANT's attempt to thwart HILES from engaging in self-dealing, as well as HILES threatening remarks to BRYANT, significant tensions arose between HILES and BRYANT. BRYANT alleges on information and belief that the Special Committee did not decide to investigate HILES's conduct at the July 2, 2021 Board meeting, as HILES, who spearheaded the Special Committee, was not inclined to investigate herself.

Up until December 8, 2021 when HILES directly contacted BRYANT's Chief of Staff and demanded that certain employee personnel information be immediately provided to HILES, BRYANT had no communication with the Special Committee, nor with any attorney from DLA Piper or any "investigator" retained through the Special Committee. After receiving HILES demand request, BRYANT informed HILES that she needed to speak with BGC counsel to discuss the legality of sharing personnel information and whether it was permissible to disclose the requested information. In addition, BRYANT attempted to engage outside counsel to further determine the legalities of providing confidential personnel files to the Special Committee. Such attempt was unsuccessful as outside counsel was unavailable.

Upon confirmation of Board member availability, a Board meeting was scheduled for

December 20, 2021 to approve BGC's 2022 budget. Leading up to the December 20, 2021 meeting, HILES repeatedly made attempts to cancel the meeting, including up until the very morning of the meeting, December 20, 2021.

**BRYANT is Suspended as CEO Without a Vote of the Board**

On or about December 20, 2021, a special and properly noticed meeting of the Board was held. BRYANT, HILES and other members of the Board were in attendance. Following the meeting, HILES requested to meet privately with BRYANT. BRYANT informed HILES that she could not meet at that the requested time due to a number of pre-existing obligations but asked BRYANT to reschedule a meeting through her assistant. In following up with BRYANT's assistant to reschedule the meeting, HILES insisted that BRYANT meet alone with all three members of the Special Committee (HILES, BROWN-PHILPOT, and WHITES). BRYANT responded that she was uncomfortable meeting with the Special Committee without the presence of counsel. BRYANT informed HILES that although she had a previously scheduled meeting with counsel on Tuesday, December 21, 2021, she was uncertain whether it would be possible for her counsel to call in for a meeting with the Special Committee. BRYANT suggested that the meeting be rescheduled in January 2022 after the holiday season.

On or about the morning of December 21, 2021, BRYANT's corporate email and access to BGC's internal portals was disabled. When BRYANT reached out to her chief of staff, LaShonda Polite to inquire about her inability to access her corporate accounts, she was told that HILES had directly contacted Ms. Polite to inform her to discontinue communication with BRYANT directly and that BRYANT was suspended indefinitely. Later in the afternoon, around 4:00 p.m., BRYANT received an email from HILES via BRYANT's personal email account, notifying her that she had been placed on indefinite suspension as CEO. The December 21, 2021 letter states that "[t]he Board of Directors have been made aware of serious allegations that involve you and we are attempting to conduct a thorough and robust investigation into those allegations. You have conducted yourself in a manner so as to disrupt and impede the ongoing investigation." The December 21, 2021 letter further notified BRYANT that Sofia Mohammed was named the interim Executive Director of BGC, and that "Counsel will reach out to you regarding the ongoing investigation, which you are required to cooperate with as an employee of BGC."

In addition to being stripped of both her email and the ability to access corporate documents,

BRYANT was also locked out of the BGC premises. BRYANT attempted to contact Sofia Mohammed but received no response. BRYANT attempted to contact her Chief of Staff, but BRYANT was informed that HILES had ordered a gag-order on all BGC personnel from communicating with BRYANT. HILES gag-order was initiated before BRYANT was notified of her suspension and that if said gag-order was violated, BGC personnel's employment would be terminated.

BRYANT alleges that upon information and belief, the termination of her access to BGC email, internal documents, and BGC's premises was intentionally initiated by HILES as a calculated scheme to preclude BRYANT's ability to affirmatively prove that HILES had engaged and was engaging in self-dealing and conflict of interest. BROWN-PHILPOT was complicit in HILES ploy as she was made privy to HILES intention. BRYANT further alleges upon information and belief that she was kept from accessing email and corporate documents in order to prevent her from communicating with BGC's counsel about her upcoming meeting with the Special Committee and the Committee's predetermined intention to suspend her.

Following the publication of BRYANT's suspension from BGC in the media, BRYANT was contacted by the law firm, Loeb & Loeb who was unaware that the BGC Board had taken any action to remove BRYANT and/or that the Board had authorized any investigation into BRYANT's alleged misconduct.

BRYANT later learned, and alleges upon information and belief, that the full BGC Board was unaware of any alleged misconduct by BRYANT prior to her suspension, and that the Special Committee, who was solely tasked with investigating various employment and HR issues, did not communicate **any** of its findings with the Board prior to her suspension. Nor did the BGC meet, discuss, or otherwise vote to remove BRYANT from her role as CEO. In fact, BRYANT's suspension was a complete surprise to many of the Board members, who only learned of BRYANT's suspension after such news was made public.

BRYANT alleges on information and belief that the alleged "investigation" by BGC and the Special Committee was an unsubstantiated, untruthful and disingenuous pretext spearheaded by HILES to have BRYANT removed as CEO in order for HILES to obtain unfettered control over BGC operations. As such, HILES sought to orchestrate the means by which to implement her personal agenda of self-dealing and perpetuation of undisclosed conflict of interest.

BRYANT further alleges on information and belief that Cross-Defendants ' HILES, BROWN-PHILPOT, and WHITES had, under the guise of a "Special Committee,' acted independently of the Board of Directors in order to (1) suspend BRYANT and prohibit her from accessing company records and information (despite otherwise being entitled to as a matter of law), (2) keep BRYANT from communicating with BGC's counsel, and (3) to conduct an unauthorized investigation concerning BRYANT's alleged misconduct in an attempt to justify the removal of BRYANT as BGC's CEO.

On or about January 10, 2021, in compliance with Corporations Code Section 5710 et seq., BRYANT sent correspondence to BGC and the BGC Board that apprised them of the allegations contained in this Complaint, as well as a draft copy of the instant Complaint to ensure that BGC was on notice of all material allegations alleged herein. BRYANT's correspondence to the Board was drafted in response to correspondence that she had received from BGC, dated January 7, 2021, which insufficiently responded to BRYANT's December 28, 2021 correspondence and requests of the Board.

**BGC Publicly Defames BRYANT**

Following BRYANT's suspension, BGC has consistently repeated false, disparaging, and defamatory statements concerning BRYANT's alleged misconduct in the public forum. Once the news about BRYANT's suspension was made public, national news sources sought comment from BGC.

BGC has repeatedly set forth a false narrative that BRYANT is being investigated for "serious allegation(s)" of misconduct. For example, when asked for comment from the news outlet Business Insider, the BGC Board emailed a statement which stated in part, that BRYANT is still a BGC staff member but that "serious allegations of workplace impropriety are being investigated." In a separate statement to Business Insider, BROWN-PHILPOT stated that the Board was investigating "serious allegations of workplace impropriety."

In addition, on or about December 24, 2021, the Special Committee (and not the entire BGC Board) released a public statement to BGC's partners and donors purporting to explain the circumstances surrounding BRYANT's suspension ("Special Committee Statement"). The Special Committee Statement read: "Earlier this year, the Board received or became aware of concerns raised by current and former employees about BRYANT's conduct. On or about October 5, the

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

Board formed the Special Committee to review and evaluate the complaints and determine what, if any, action should be taken with respect to these concerns." The Special Committee Statement was issued and signed by HILES.

After obtaining legal counsel, BRYANT issued a demand letter to BGC's counsel dated December 28, 2021 ("Demand Letter"), regarding the events leading up to BRYANT's suspension. The Demand Letter demanded, among other requests, that BGC produce all documents to which BRYANT is entitled pursuant to Corporations Code Section 6334. The Demand Letter further requested that BRYANT be immediately reinstated as CEO and that BGC refrain from further defamatory and disparaging public comment regarding the purported investigation into BRYANT's alleged and unsubstantiated misconduct. To date, BGC has failed to provide the records to which BRYANT is entitled as a matter of law and has otherwise failed to reinstate her access to emails and organizational documents.

As a result of both BRYANT's suspension and public comments made by various representatives of BGC, BRYANT's opportunities and offers to speak at public engagements have precipitously declined despite having consistently received such offers prior to CROSS-DEFENDANTS' unfounded assertions and insinuations. BRYANT is a prominent public speaker who has annually addressed private and public engagements with approximately twenty appearances per year.

At the time of BRYANT's suspension, BRYANT was a finalist for selection as a director for a for-profit corporation. As a result of BGC's unlawful suspension, BRYANT has been informed that she is no longer a candidate for that director position.

At the time that BGC announced to the general public that its Board was investigating "serious allegations of [BRYANT's]workplace impropriety," the Board had not yet actually commenced any formal or informal investigation BRYANT and/or her leadership of BGC.

**HILES Continues to Act Without Board Approval**

Less than two weeks following BRYANT's wrongful suspension from BGC, HILES continued to act on BGC's behalf without obtaining the required approval from the BGC Board. On information and belief, HILES, purportedly under the authority of the Special Committee, began a campaign of unilaterally providing various BGC employees promotions and salary increases in a transparent attempt to garner favor with BGC employees and to differentiate her management

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

demeanor from BRYANT's. On information and belief, beginning in January 2022, HILES, has exercised carte blanche authority over the approval of new executive hires and has unilaterally assumed operational control over organizational matters without consideration and oversight by the BGC Board. Such conduct is in blatant contravention of BGC's institutional policies and its bylaws.

58.   BRYANT alleges upon information and belief that HILES unilaterally ordered BGC's Vice president of Human Resources, Karla Tai, to increase the salary of BGC's interim Executive Director, Sofia Mohammed to the same amount as BRYANT had been receiving as CEO. As such request occurred prior to the BGC Board receiving results of the investigation into allegations against BRYANT, such salary increase unequivocally demonstrates that HILES and BGC intended to remove BRYANT as CEO regardless of the findings of the purported investigation.

**BGC Wrongfully Removes BRYANT from BCG's Board and Wrongfully Terminates her Employment**

After the Board suspended BRYANT from her position as BGC's CEO, and after the Board prematurely and falsely announced to the general public that it was investigating "serious allegations of workplace impropriety," the Board finally retained an outside lawyer, Aisha Adams ("Adams"), to investigate allegations concerning BRYANT and her leadership of BGC.

Adams interviewed approximately 25 current and former BGC employees regarding BGC workplace and culture between March 2022 and July 2022. BRYANT agreed to voluntarily meet with Adams and as such, sat through four separate one hour interview sessions with her in July 2022.

On August 12, 2022, the Board held a special Zoom meeting to allegedly review the results of the internal investigation and to review BGC financial performance. The Board summarily refused to share organizational financial documents with BRYANT. Instead of addressing the previously decided agenda items, the Board was confronted with a request by Board member PHILPOT to immediately convene a vote on BRYANT's removal as a BGC board member. PHILPOT addressed the Board with a prepared resolution moving to formally remove BRYANT as a Board member before addressing any of the items on the meeting's agenda. When BRYANT objected to BROWN-PHILPOT's motion and asked for clarification on why she was being removed from the Board, BROWN PHILPOT declared that it was for the "good of the organization."

BRYANT insisted that the results of the investigation be shared with the Board before

moving forward with BROWN PHILPOT's motion and subsequent vote in order to ensure that all Board members were apprised of the results of the investigation. Such was imperative as the "Special Committee" affirmatively asserted that no one had been made privy to the results of the investigation up to that point. In contravening Board protocol by withholding information that was imperative for rendering a reasonably informed vote, the "Special Committee" arrived at the meeting with a detailed, pre-drafted resolution in hand to remove BRYANT.

As a sitting BGC Board member, BRYANT had a contractual right under BGC's Bylaws to cast a vote on her removal and/or termination as had all BGC Board members. Indeed, BGC confirmed this right by providing BRYANT with notice of the Board's special meeting and log-in credentials for the special meeting's Zoom session.

BRYANT was present over Zoom for the beginning of the August 12, 2022 special meeting. However, HILES and BGC's counsel required that BRYANT be temporarily excluded from the meeting while Adams presented the BOARD with her investigative findings. BRYANT protested her removal but was removed from the Zoom session by HILES.

In BRYANT'S absence, Adams presented the BOARD with her investigative findings. Adams informed the BOARD as to the specific allegations levied against BRYANT, including the unsubstantiated allegations pertaining to BRYANT's mismanagement and mistreatment of employees.

During Adams' presentation, members of BGC's Board communicated with each other through Zoom's chat feature. Several Board members stated that they were unaware of any direct allegations made against BRYANT and/or that Adams had been hired to conduct a formal investigation that examined more than 26 current and former BGC staff members and consultants.

BRYANT learned of these chat communications as they occurred from members of the BGC Board who were in attendance and were participating in the special meeting. BRYANT informed her legal counsel, who immediately sent BGC'S counsel (who was also participating in the special meeting over Zoom) an e-mail demanding that all Zoom chat communications (including those relating to the investigation) be preserved.

At the end of Adams' presentation, the Board voted on BRYANT'S removal from the Board and her termination as CEO. The Board was well aware that BRYANT was excluded from the Zoom call but made no attempt to make contact with her or her counsel to allow her to rejoin the

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

call-in order to cast her vote. The Board was also aware that BRYANT was waiting to rejoin the main session by, among other things, the fact the Board's counsel received a contemporaneous e-mail from BRYANT'S counsel discussing events taking place during the meeting. Nevertheless, BGC refused to permit BRYANT to rejoin the Zoom session where the vote on her removal and termination were taking place. BGC's Board voted 3-2 to remove BRYANT's Board appointment and to terminate her employment. As was her right under BGC's bylaws, had BRYANT been able to participate in the vote, she would not have been removed as a Board member or terminated as BGC's CEO.

**BGC Continues to Retaliate Against Bryant After her Removal and Termination.**

Despite DEFENDANT's most egregious, illegitimate and reprehensible conduct as articulated above, BGC and CROSS-DEFENDANTS continue their wrongful campaign of harassment and retaliation against BRYANT even though she is no longer a Board member or employee.

On account of CROSS-DEFENDANTS' wrongful termination, BRYANT lost her family's health insurance. Under relevant federal and California law, BGC was required to give BRYANT statutory notice of her right to COBRA and Cal-COBRA continuation coverage within 14 days of her August 12, 2022 termination. Despite repeated inquires by BRYANT, BGC initially refused to provide BRYANT statutory notice of her right to continued coverage. BRYANT only received such notice on September 20, 2022, some thirty-nine days after her purported termination.

In addition, BRYANT was denied the proper distribution of her remaining vacation days. In a memo from BGC VP of Human Resources, Karla Tai, BRYANT was informed that her final pay would include a randomly generated three weeks of vacation. When BRYANT contested the accuracy of vacation pay calculation, Ms. Tai responded with an updated and increased distribution which was still incorrect as to the amount due BRYANT.

On August 22, 2022, BGC filed a baseless federal lawsuit in the Northern District of California entitled BGC v. Kimberly Bryant and Doe 1, Case No. 3:22-CV-04801-JSC. In that lawsuit, BGC accused BRYANT of hacking into a server containing BGC's website code, content, and other components and damaging and/or deleting these items resulting in the disablement of BGC's website. Such allegations are unfounded as BRYANT did not have access to BGC's website files and did not delete or destroy any of the website's components. The BGC website was, and

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

remains, perfectly functionable. Indeed, BGC was forced to amend its complaint when faced with indisputable proof that its website was not disabled by any wrongful conduct by BRYANT.

BGC'S continued harassment and retaliation has and will continue to significantly damage BRYANT. Among other things, BRYANT has lost multiple lucrative speaking engagements as a result of BGC's wrongful accusations and termination. Moreover, BRYANT has been forced to incur substantial attorneys' fees and expenses defending against BGC's frivolous federal lawsuit.

Contrary to Plaintiff's assertion in the complaint, BRYANT established Black Girls Code as a sole proprietor in 2010. In fact the initial website for Black Girls Code was a website that was designed, coded, and managed by BRYANT on a service called Weebly which she currently still owns and maintains. When BRYANT created the website for Black Girls Code in 2011 she purchased with her own funds the stated domains; Specifically, she caused BGC's domains <blackgirlscode.com>,<blackgirlscode.org>, <blackgirlscode.site> and <blackgirlscode.net>. These domains were purchased with BRYANT'S personal funds and hosted on a hosting service from Register.com which BRYANT was also the sole account owner. During no time did BRYANT transfer ownership of the original Black Girls Code website, the named domains, or her ownership of the Register.com account to BGC Inc.

When BRYANT created her company brand name (BLACK GIRLS CODE) in 2011 as a sole proprietor with her own funds she also solicited the creation of several logos (the legacy marks) via design service 99Designs. These logos and brand marks purchased by BRYANT in 2011 were originally used on the website BRYANT used for her company. BRYANT maintains the ownership of copyrights for these logos which were secured via 99Designs. The website, the original logos, and all copyrights were used by BRYANT and her company BLACK GIRLS CODE from 2011 and beyond. The original Weebly website was used by BRYANT to advertise her pilot program in 2011 and included photos of the program taken by BRYANT as well as personal blog posts which BRYANT wrote. The website, domains, copyrights were assigned to BRYANT acting as FBN BLACK GIRLS CODE registered in San Francisco County at two subsequent addresses owned by BRYANT. Her home address (1725 Washington Street, San Francisco, CA 94109) and her personal post office box (P.O. 640926, San Francisco, CA 94164).

In 2012 BRYANT obtained a trademark for the company name she created BLACK GIRLS CODE. The trademark was assigned to BRYANT'S sole proprietorship BLACK GIRLS CODE.

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

1  BGC Inc improperly altered the registered ownership of the trademark in 2022 and changed the

2  registered owner to BGC INC.

3        From 2011 to 2018 BRYANT was the sole administrator of the legacy website created in

4  2011 by BRYANT. No other employees had access to the Weebly website or made changes to any

5  content besides BRYANT.

6        . The individual named in the BGC complaint (John Hanawalt) was not a retained contractor

7  of BGC Inc. Instead, Mr. Hanawalt volunteered his services to Black Girls Code to provide design

8  guidance for a possible future website design for the company. At no time was Mr. Hanawalt

9  retained by the company to redesign the legacy website. BGC Inc did in fact hire and retain a web

10  design firm in 2019 to redesign the legacy website. The design firm led by a team managed by BGC

11  employee Ewurabena Ashun developed a new Wordpress website which is currently used by BGC

12  Inc. BRYANT was not directly involved in the administration of the new website and as stated in

13  declaration from Ewurabena Ashun did not have access to make changes or alter the BGC Inc

    website built in Wordpress and hosted on Bluehost.

14        The original (legacy) website which BRYANT designed and developed for BLACK GIRLS

15  CODE was created on a platform called Weebly in 2011. The legacy website was hosted on

16  Register.com not on Bluehost.com which are different entities.  BRYANT also purchased and

17  maintained the domains in question from Register.com.  The current and existing BGC INC website

18  it was built as a Wordpress website in 2019 with separate administrative controls than the original

19  Weebly site. It is hosted on Bluehost, but the content and administrative controls and changes are

20  administered via Wordpress not Bluehost.

21        As noted in her declaration Ewurabena Ashun transferred administrative controls of the

22  BGC Wordpress website and Bluehost to Karla Tai, BRYANT does not and has never had access to

23  make changes to the BGC INC Wordpress website. BGC INC maintained administrative control of

24  the BGC website from December 2021 to the date of this claim and actively updated it via

25  Wordpress and made changes unhindered to the content via their Wordpress account which

26  BRYANT did not and had not ever had access.

## A. ADMISSIONS & DENIALS

27    1.  Defendant admits the allegations in paragraphs 20 stating: "The BGC Website allows girls

28  ages 7 through 17 to enroll in programs and services, advertises upcoming events, provides

news relevant to its intended beneficiary class, contains information regarding its various chapters and how to get involved, and allows visitors to make donations and volunteer, both of which BGC relies on to operate." Defendant denies the remainder of the allegations in paragraph 20.

2. Defendant denies the allegations in paragraphs 21-57.

## B. AFFIRMATIVE DEFENSES

1. Defendant/Cross-Complainant is not liable to Plaintiff/Cross-Defendants because Defendant/Cross-Complainant engaged in fraud, illegality and wrongful termination of Plaintiff/Cross-Defendant's employment and violations of laws.

2. Plaintiff/Cross-Defendants engaged in illegal conduct with Unclean hands, oppression, malice and fraud in a conspiracy to steal and convert Defendant/Cross-Complainant's non-profit corporation to their own use, with a motivation of greed and financial gain.

3. Plaintiff/Cross-Defendants and their agents are responsible for their own alleged harm and damages.

4. Plaintiff/Cross-Defendants complaint fails to state a claim or cause of action for which relief can be obtained.

5. Plaintiff/Cross-Defendants are negligent and the proximate cause of any alleged damages or harm.

6. Plaintiff/Cross-Defendants have suffered no damages.

7. Plaintiff/Cross-Defendants alleged damages are caused by a Supervening Cause, unrelated to Defendant/Cross-Complainant's action or conduct.

8. Plaintiff/Cross-Defendants alleged damages are caused by Plaintiff/Cross-Defendants Wrongful Termination of Defendant/Cross-Complainant's Employment.

9. Plaintiff/Cross-Defendants complaint fails to state a claim because of the defense of Truth

10. Plaintiff/Cross-Defendants alleged damages are caused by Sole Negligence of Co-Cross-Defendant

11. Plaintiff/Cross-Defendants always engaged in conduct of Prevention and Frustration when Defendant/Cross-Complainant Was Ready, Willing and Able to Perform the Contract, and Plaintiff/Cross-Defendants Prevented and Frustrated Such Performance.

12. Plaintiff/Cross-Defendants complaint is barred because of Lack of Consideration.

18

DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER

13. Plaintiff/Cross-Defendants complaint is barred because of Failure of consideration.

14. Plaintiff/Cross-Defendants complaint is barred because of Intervening Cause of conduct of Cross-Defendants

15. Plaintiff/Cross-Defendants complaint is barred because of Lack of Causation.

16. Plaintiff/Cross-Defendants complaint barred is because Defendant/Cross-Complainant exercise of Free Speech

17. Plaintiff/Cross-Defendants complaint is barred because Frustration of Purpose.

18. Plaintiff/Cross-Defendants complaint is barred because Defendant/Cross-Complainant at all times exercise of Good Faith By Answering Defendant

19. Plaintiff/Cross-Defendants complaint is barred because Illegality by Plaintiff/Cross-Defendants.

20. Plaintiff/Cross-Defendants complaint is barred because Plaintiff/Cross-Defendants' Failure to Take Advantage of Effective System.

21. Plaintiff/Cross-Defendants complaint is barred because Plaintiff/Cross-Defendants' Failure to Join an Indispensable Party

22. Plaintiff/Cross-Defendants complaint is barred because Plaintiff/Cross-Defendants' Failure to Mitigate Damages

23. Plaintiff/Cross-Defendants complaint is barred because of Estoppel.

24. Plaintiff/Cross-Defendants complaint is barred because of Equitable Estoppel

25. Plaintiff/Cross-Defendants complaint is barred because of it is Contrary to Public Policy

26. Plaintiff/Cross-Defendants complaint is barred because alleged Damages Were the Result of Unrelated, Pre-Existing, or Subsequent Conditions Unrelated to Defendant/Cross-Complainant's Conduct.

27. Plaintiff/Cross-Defendants complaint is barred because Comparative Fault of Third Parties

28. Plaintiff/Cross-Defendants complaint is barred because Defendant/Cross-Complainant's Complete Performance.

29. Plaintiff/Cross-Defendants failed to discharge all Conditions Precedent.

30. Plaintiff/Cross-Defendants complaint is barred because Plaintiff/Cross-Defendants' Own Conduct, or By the Conduct of Its Agents, Representatives, and Consultants

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

31. Plaintiff/Cross-Defendants complaint is barred because Plaintiff/Cross-Defendants failure to exercise sound Business Judgement under the Business Judgement Rule.

32. Plaintiff/Cross-Defendants complaint is barred because Plaintiff/Cross-Defendants' Breach of Contract.

33. Plaintiff/Cross-Defendants complaint is barred because Plaintiff/Cross-Defendants' unconscionable  conduct inflicted on Defendant/Cross-Complainant, including the bad faith breath of contract, wrongful and illegal removal of Defendant/Cross-Complainant from the board and wrongful termination of Defendant/Cross-Complainant's employment as CEO of BGC, the nonprofit  Defendant/Cross-Complainant founded and grew into a viable business for the public purpose of uplifting Black and marginalized girls.

34. Defendant/Cross-Complainant hereby asserts a Reservation of Right to Add Additional Affirmative Defenses.

### C. COUNTERCLAIMS

3.  Plaintiff/Cross-Defendant is liable to defendant because plaintiff engaged in the unlawful conduct set forth in the attached Counterclaims and Cross-Complaint filed concurrently herewith and incorporated as though fully set forth herein.

### D. CROSS-CLAIMS

4.  Cross-Defendants, and each of them, HEATHER HILES, an individual; STACY BROWN-PHILPOT, an individual, SHERMAN WHITES, an individual; and SOFIA MOHAMMED are liable to defendant because each engaged in the unlawful conduct set forth in the attached Counterclaims and Cross-Complaint filed concurrently herewith and incorporated as though fully set forth herein.

### PRAYER

5.  For these reasons, Defendant/ Cross-Complainant and asks the Court to do the following:

    a.    Render judgment that Plaintiff/Cross-Defendant take nothing.

    b.    Dismiss Plaintiff/Cross-Defendant's suit with prejudice.

    c.    Assess costs against Plaintiff/Cross-Defendant.

    d.    Award defendant attorney fees against Plaintiff/Cross-Defendant

    e.    Render judgment for Defendant/Cross-Complainant against Plaintiff/Cross-Defendants, and each Cross-Defendant, as outlined and prayed for in the

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**

1    Defendant/Cross-Complainant's Cross-Complaint/Counter Claim, including

2    economic and non-economic damages and attorneys' fees.

3         f. Award Defendant/Cross-Complainant all other relief this Court deem fair, reasonable

4    and just.

5    Dated: March 14, 2023                    **LAW OFFICES OF BONNER & BONNER**

6

7                                            /s/ *Charles A. Bonner*

8                                            CHARLES A. BONNER
                                             Attorney for Defendant/Cross-Complainant
9                                            Kimberly Bryant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT/CROSS-COMPLAINANT KIMBERLY BRYANT'S ANSWER**